IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MAX SEIFERT, )
)
       Plaintiff, )
)
v. ) Case No. 08-02427-EFM-JPO
)
KANSAS CITY KANSAS COMMUNITY )
COLLEGE, by and through its BOARD )
OF TRUSTEES, )
)
       Defendant. )
_____)

## Findings of Fact and Conclusion of Law

Plaintiff Max Seifert ("Seifert") sued Defendant Kansas City, Kansas Community College ("College") under 42 U.S.C. § 1983, alleging that College terminated him without providing the process due him under the Fourteenth Amendment of the U.S. Constitution. Plaintiff prayed for an order setting aside his termination pending the College granting him his due process hearing, and for money damages representing the difference in his compensation from the College and his compensation from subsequent employment from his termination to the date of such hearing. Defendant denied that Plaintiff had a property interest in his job and that he was therefore entitled to due process; denied that he had been denied due process, alleging instead that he had waived it; and denied that Plaintiff was due money damages. This matter came for bench trial on January 4, 2010. The Court has thoroughly considered the evidence and argument presented at trial, the parties' post-trial submissions, and the relevant law, and makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

**Findings of Fact**

Seifert retired from the Kansas City, Kansas Police department in late 2005 following a 30-year career. He was employed by College as a campus police officer beginning January 30, 2007, at an annual salary of $30,292. His employment continued until May 16, 2008.

Defendant College is a Kansas community college, organized and existing under the laws of the state of Kansas. A seven member Board of Trustees, elected by voters in the area served by College, oversees the operation of College. The Board of Trustees have enacted, and from time to time revised, a 176-page policy handbook regulating a myriad of aspects of the school's operations, including employment.

Campus police officers patrol the grounds of College to insure the safety of students, staff, and visitors, and to protect College's facilities. They have authority to issue verbal warnings or traffic citations on College's campus. They are authorized to carry firearms in connection with their duties, and regularly do so. Commander Greg Schneider is the Chief of Campus Security / Chief of Police for College, and was Siefert's supervisor throughout his employment with College.

Because Seifert had worked as a detective with the Kansas City, Kansas Police Department, Chief Schneider had Seifert handle several investigations in addition to patrol duties. Seifert received a formal performance evaluation on February 12, 2008, roughly corresponding to his anniversary date, reflecting he "meets excepted levels of performance." Chief Schneider approved of that evaluation.

On April 4, 2008, a staff employee of College, Monica Roberts, complained to Chief Schneider that Seifert had stopped her vehicle without any justification. The employee complained that Seifert had been rude. Chief Schneider contacted Seifert by police radio and asked him to report to the police office to discuss the complaint. When Seifert arrived at the office, Chief Schneider

2

asked Seifert to sit down in his office along with Ms. Roberts to discuss the matter. Seifert refused to do so as long as Ms. Roberts was present. Chief Schneider repeated the request once or twice, and Schneider again refused. Instead, Schneider walked to the back of the police officer area.

At trial, Chief Schneider testified that he gave Seifert direct orders to sit down in his office. Seifert testified he did not construe Chief Schneider's statements as orders. After this initial conversation with Seifert, Chief Schneider asked Ms. Roberts if she could leave the office and allow him to contact her later to hear her complaint. She agreed and left Schneider's office. Chief Schneider then again made multiple requests that Seifert come into his office to discuss the matter. Seifert initially declined, responding once by asking if he was under arrest, but ultimately complied. Following the meeting, Seifert returned to patrol duties that day and worked each of his regularly scheduled shifts until April 9. Chief Schneider met separately with Ms. Roberts later on the afternoon of April 4.

On April 8, Seifert was informed by a memo from Chief Schneider that Leota Marks, dean of human resources and affirmative action at the college, wanted to meet with him that afternoon. Seifert met with her, and they discussed the traffic stop. Following the meeting, Seifert called Chief Schneider to discuss the situation. During that telephone call, Seifert was unhappy that Chief Schneider had not given him advance notice of the topic of the meeting, and he told Chief Schneider he did not believe the Chief backed up his officers. Chief Schneider told Siefert that he wanted to meet with him the next day.

On April 9, 2008, Chief Schneider and Seifert met in the Chief's office, where Seifert again said he believed Chief Schneider did not back up his officers. Chief Schneider said he felt it necessary to impose some form of discipline on Seifert because of his conduct at the police department office on April 4. The April 9 meeting was the subject of widely differing testimony

at trial. Seifert claimed that Chief Schneider became loud and accusatory during the meeting. Chief Schneider claimed that Seifert was beligerent, said that he did not have to take this kind of treatment and got up to walk out. Also during this meeting, Seifert stated that he would not have done anything different regarding the incident. For purposes of this Order, the Court does not have to determine which account of the private meeting between the two men is most accurate.

As Seifert walked out of the Chief's private office into the main office, the testimony is clear that Chief Schneider asked Seifert if he was resigning. Seifert claims that Chief Schneider asked "What's it going to be; termination or resignation?" College claims that Seifert responded to Chief Schneider's questions by replying "termination, resignation, whatever." It is undisputed, however, that at that point Chief Schneider informed Seifert that he was suspended immediately, and directed him to leave the campus. Chief Schneider further testified that when he asked Seifert, as both men walked towards the parking lot, if Seifert understood that he had been suspended, Seifert told Chief Schneider not to speak to him.

Chief Schneider concluded, and the Court finds, that both on April 4, 2008 and on April 9, 2008, Seifert had been defiant and insubordinate. In a memo to Dean Leota Marks, dated April 10, 2008, but which Chief Schneider testified he had begun drafting the prior date, he recommended termination of Seifert. The memo set forth the events of both dates. The Court finds that the memo is substantially accurate.

On April 11, 2008, Dean Marks spoke by telephone with Seifert. She told him that she wanted to schedule a meeting to discuss the recommendation for his termination. Dean Marks told Seifert that only he, Chief Schneider, and she would participate in the meeting. Seifert asked Dean Marks if he could have a lawyer present and was told he could not. Seifert told Dean Marks that he would get back to her about attending such a meeting.

On April 17, Seifert spoke with Dean Marks to request that his wife be permitted to pick up his paycheck, and also that she be provided a copy of College's policy handbook which he could review to determine his options. Dean Marks agreed to this request.

By letter dated April 18, 2008, Dean Marks provided Seifert written and official notification of suspension of employment as of April 9, 2008, and notification of receipt of a recommendation from his superior for the termination of his employment. Dean Marks again invited Seifert "to come in for your due process meetings to meet in order to discuss this recommendation. You told me you would follow up with me but as of this date, I have not heard from you regarding this matter. Please contact me to let me know your intentions regarding this meeting as soon as possible." Seifert received this letter on or about April 19, 2008. Seifert did not schedule this meeting, and it was never held. The Court ruled prior to trial that, to the extent that Seifert had a procedural due process right to a pretermination hearing, he waived that right by his non-response.

Typically, at such a meeting with a staff employee of the college (the procedure is different for faculty, but those procedures are not relevant to a staff member such as a campus police officer), Dean Marks and the supervisor would outline the reasons for the termination recommendation. The employee would be allowed to respond and ask questions. The employee would not be permitted to question witnesses regarding the grounds for termination or have legal counsel present. At the conclusion of the meeting, Dean Marks would give the staff employee a termination letter. The letter would inform the individual that he or she no longer has a job with the college, state in general terms the reason for the termination, and advise of any rights to continuing benefits, such as health insurance. Dean Marks would collect college property from the employee, such as keys and ID card.

By letter dated April 29, 2008, attorney G. Gordon Atcheson advised Dean Marks that he was representing Seifert in connection with job action taken by College against him. Attorney Atcheson acknowledged Dean Marks' request that Seifert attend a meeting but declined to have Seifert participate in any such meeting because "I hold out only the faintest hope that a meeting would actually be intended to fairly air the issues, whatever they may be, surrounding Officer Seifert's employment." Because Seifert did not respond to Dean Mark's request to schedule a meeting with her, by letter dated May 16, 2008, she advised Seifert that his employment with the College was terminated effective that day. Cause for termination was provided, pursuant to policy no. 5.00 of the Handbook of Policies and Procedures, as "insubordination or other disrespectful conduct."

The Board of Trustees routinely reviews and approves staff personnel changes at its monthly meeting. Those changes, entailing recommendations for hiring or termination, typically go before the Board of Trustees as a single agenda item. Seifert's termination was presented to the Board of Trustees at its June 17, 2008 meeting as one of nine personnel matters. The Board voted without discussion to approve all of the personnel recommendations, including Seifert's termination.

Following the meeting with his or her supervisor and Dean Marks, a staff employee has no other forum or opportunity to be heard on or to challenge a termination. The college has no policies, rules, or procedures for a staff employee to have a post-termination hearing regarding his or her employment, whether in front of the Board of Trustees or otherwise. Dean Marks testified that the Board of Trustees sets aside a portion of its meeting time for public comments and a staff employee could speak at that time regarding his or her termination. However, such a public comment opportunity could not be deemed a post-termination due process hearing.

The College has adopted, through its Board of Trustees, a "Policy Handbook." Such polices and procedures, "except as otherwise specified ... shall apply to all employees of Kansas City Kansas Community College with the exception of those matters embodied in any master contract with 'professional employees' of the College, terms defined in KSA 72-5413, and/or specific to administrators and at the discretion of the President and/or the Board of Trustees." Unlike the Master Contract negotiated with the collective bargaining unit of the "professional employees" (that is, the teachers/professors of the College), the Policy Handbook governing all other employees (including Seifert as a "staff employee") was not bargained for or negotiated, but rather was unilaterally adopted by the governing body of the College - the Board of Trustees.

Seifert acknowledged that the Policy Handbook created no contractual or legal rights in his favor by signing, on or about February 16, 2007, an "Employee Acknowledgment Form" in which he represented that he had received the handbook and "[f]urthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document." Relevant provisions of the Policy Handbook are as follows:

>  a. The Policy Handbook is designed to acquaint employees with College, and provide them information affecting their employment. (Introductory Statement).
> 
> b. To ensure orderly operations and provide the best possible working environment, College expects employees to follow rules of conduct. While not possible to list all forms of behavior that are considered unacceptable in the workplace, examples of infractions which may result in disciplinary action, up to an including termination of employment, are provided. These examples include insubordination or other disrespectful conduct. (Policy 5.00).

c. Employment with College may be terminated due to resignation, discharge, or retirement, among other reasons. Discharge of an employee can be for any reason not prohibited by law. (Policy 6.00).

d. Prior to termination of employment, an employee *may* be given a notice of intent to terminate by his or her supervisor. The notice, *if given*, will state the reason for the pending termination. Upon receipt of the notice of intent to terminate, the employee shall receive the due process review required under applicable law. Over two dozen examples of conduct for which an employee may be terminated are provided, but termination is not limited to items on the list. College reserves the right to recommend termination for actions not listed. (Policy 6.00, emphasis added).

e. Employees not on probation are entitled to procedural due process. Generally, the rights and processes are embodied in the adopted Grievance Procedures. (Policy 6.02).

f. The purpose of the grievance procedure is "to secure at the lowest possible level an equitable solution arising out of a complaint concerning an alleged violation of an Administrative or Board of Trustees policy affecting working conditions." A multiple step process is created, with participants moving to the next step only if the issue is not resolved. (Policy 6.03).

Dean Marks testified that the grievance procedures set forth in Policy 6.03 only apply to current employees and have no application after employment termination. Based on the plain language of the grievance procedures, the Court finds this to in fact be the case.

**Conclusions of Law**

Seifert's Section 1983[1] Complaint alleges that College deprived him of procedural due process under the Fourteenth Amendment[2] in terminating his employment. Seifert's claim is against College only; no causes of action are stated against any individual decision makers, such as Chief Schneider or Dean Marks. Despite the evidence and arguments presented to the Court regarding the justification of College's decision to terminate Seifert's employment, the parties agree that the justification of College's decision to terminate Seifert's employment is not relevant here. The sole issue presented is Seifert's allegation that his procedural due process rights were violated by the manner in which College terminated his employment.

To establish a deprivation of procedural due process in his termination, Seifert must satisfy a two step inquiry. First, he must establish that he had a protected property interest in continued employment with College to which due process rights apply, and second, he must then demonstrate the he was deprived of the appropriate level of procedural process due in the manner by which his employment was terminated.[3]

Where an employee can only be terminated for certain reasons, his or her expectation of continued employment rises to the level of a protected property interest that is sufficient for the procedural due process protections of the Fourteenth Amendment to attach.[4] The determination of whether a public employee such as Seifert had a "legitimate claim of entitlement" in his continued

---

[1] 42 U.S.C. § 1983.
[2] U.S. Const. amend. XIV.
[3] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Copelin-Brown v. New Mexico State Personnel Office*, 399 F.3d 1248, 1254 (10th Cir. 2005); *Hennigh v. City of Shawnee*, 155 F.3d 1249 (10th Cir. 1998).
[4] *Board of Regents v. Roth*, 408 U.S. 564, 577-78 (1972); *Copelin-Brown*, 399 F.3d at 1254.

employment is made by reference not to the U.S. Constitution, but to various independent sources such as state laws, local ordinances, established rules or mutually explicit understandings.[5]

Under Kansas law, when a public employee is terminable at will, he or she does not possess a protected property interest in continued employment; however, when the employee is only terminable for cause, that employee has a protected property interest in continued employment under state law.[6]

Seifert claims a protected property interest in continued employment under the employment policies created by the Board of Trustees of College. A written personnel policy is insufficient in and of itself to create a legally protected expectation of continued employment. "Personnel rules which are not bargained for cannot form an express or implied contract of employment as they are merely a unilateral expression of 'company policy.'"[7]

Seifert distinguishes this well settled rule by disclaiming any *contractual* right in his job, whether arising under the personnel policies or otherwise. Instead, he argues that the policies the Board of Trustees adopted create a protected property interest because they were adopted by the Board in a legislative capacity. He argues that community colleges in Kansas function as political subdivisions of the State.[8] The board of trustees of a community college exercises broad legislative powers related to the school under K.S.A. § 71-201. And, he argues, acting as a legislative body, the College Board adopted the policies and procedures regulating the employment relationship between the school and its workers. The policies, therefore, carry the force of law in contrast to

---

[5]*Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131 (10th Cir. 1994) *(citing Roth*, 408 U.S. at 577). *See also Anglemyer v. Hamilton County Hosp. et al.*, 58 F.3d 533 (10th Cir. 1995) (including "university rules" as another such independent source of creation of an expectation of continued employment).

[6]*Getz v. Bd. of County Comm'rs of Shawnee County*, 194 F. Supp. 2d 1154 (D. Kan. 2002) (citing *Stoldt v. City of Toronto, Kan.*, 234 Kan. 957, 964-65, 678 P.2d 153 (1984)).

[7]*Getz*, 194 F. Supp. 2d at 1168.

[8]*Bland v. Kansas City, Kan. Cmty. Coll.*, 271 F. Supp. 2d 1280, 1391 (D. Kan. 2003).

10

workplace rules an employer may choose to follow or may change at any time without formal action. In short, he contends, the policies stand on the same legal footing as municipal ordinances and county resolutions. They are sufficient to create property interests requiring due process protections.

College denies that its personnel policies have the force of legislative enactment or municipal ordinance. College argues that its Board adopted these policies acting not in a legislative capacity, but rather in a managerial capacity, acting simply as the governing board of an employer.

Seifert's argument that College's Board enacted these personnel policies in a legislative capacity, and as such they have the force of law, is difficult to understand or accept. Granted, the Board is authorized by state law to act with limited legislative powers; however, it is difficult to read the Policy Handbook as anything other than an employer-adopted personnel manual. It does not differ significantly, for these purposes, from any other such handbook, and clearly is limited in its scope and effect to College's employees. Not everything a local governing body does is an exercise of its legislative authority. A similar issue existed in *Farthing*, where the district court found, and the circuit court agreed, that the personnel manual adopted by the City of Shawnee restricted the city manager's removal power to remove only for "cause."[9] However, the circuit court noted that "this fact alone is insufficient to permit the implied contract issue to survive summary judgment" and, because it had previously held that the municipal ordinances pertaining to employment and requiring compliance with portions of the personnel manual did not require compliance with the "removal only for cause" provisions of that manual, it affirmed the district court's summary judgment order for the city.[10] Likewise here, the Policy Handbook, cited and relied upon by both parties, seems clearly an exercise of the Board's managerial authority to operate the College, not an enactment with

---

[9] 39 F.3d at 1139.

[10] *Id.*

11

the force of law. It may not be relied upon for a claim of a protected property interest in continued employment any more than any other employer's personnel manual may.[11]

Moreover, even if the Policy Handbook had the force of law so that it rose above a mere unilateral expression of employer policy and could be relied upon for expectations of continued employment, its provisions would not support such expectations. For a public employee in Kansas to have a property interest in continued employment, the employee must be terminable only for cause.[12] Seifert argues that an expectation of continued employment that creates a property interest may arise merely by a public employer limiting its unfettered ability to terminate employees. But the law does not stretch quite as far as Seifert asserts. He cites *Farthing* for this principle. The cited passage actually reads as follows:

> In the absence of any evidence to the contrary, a public employee terminable at-will does not possess a protected property interest under Kansas law for purposes of procedural due process analysis. . . . In those situations, however, where state law restricts a government employer's removal power by requiring some type of "cause" or "fault" before taking any adverse action against the employee, then the Kansas Supreme Court has declared the employee does possess a protected property interest. As a result, the requirements of due process are applicable and the employee must, at a minimum, receive notice and an opportunity to be heard.[13]

Thus, where the relevant state of Kansas statute regarding the appointment and removal of city law enforcement officers created no requirement that a city council "have or give cause for termination," no constitutionally protected property right was found to exist in the night watchman position at issue.[14] Where a Kansas statute prohibited "only retaliatory terminations and does not require termination for cause or otherwise limit a hospital's employment decisions," no property

---

[11]*Dickeson v. Quarberg*, 844 F.2d 1435, 1439 (10th Cir. 1988).

[12]*Kosik v. Cloud County Cmty. Coll.*, 250 Kan. 507, 512, 827 P.2d 59 (1992).

[13]39 F.3d at 1136 (citing *Kosik*, 250 Kan. at 511, 827 P.2d at 63).

[14]*Stoldt*, 234 Kan. at 965.

interest was created for procedural due process purposes.[15] And where personnel rules entitled plaintiff to a performance evaluation, but did not mandate that plaintiff could only be terminated for cause, no substantive property interest in continued employment was created.[16]

Accordingly, Schneider had a property interest in his expectation of continued employment with College only if he was terminable only for cause. And, even if the Court were to accept his argument that College's Policy Handbook was more than a unilateral expression of the employer's policy, but rose somehow to have the force of law or ordinance, the plain provisions of that Policy Handbook do not restrict termination to cause, and therefore, do not create a property interest in Schneider's employment. It not only lacks a clear statement to that effect, but plainly states that "discharge can be for any reason not prohibited by law."[17] Although it creates a notice and hearing process, such a process is clearly not mandatory, but is one which "may" be given by a supervisor, and a reason for pending termination required only "if [notice is] given."[18] It does state that employees who are not on probation are entitled to procedural due process,[19] but that provision must be read in light of the foregoing statements, and of the statement that an "employee shall receive the due process review required under applicable law."[20] The Court cannot read the reference to applicable law as creating procedural due process obligations beyond what the law would require. And, for the reasons stated above, the Court concludes that the law did not create a protected property interest in Schneider's expectations of continued employment to which procedural due process rights apply.

---

[15]*Anglemyer*, 58 F.3d at 540-41.

[16]*Getz*, 194 F. Supp. 2d at 1168.

[17]Policy 6.00, Kansas City Kansas Community College Policy Handbook (Exhibit 1).

[18]*Id.*

[19]Policy 6.02, Policy Handbook.

[20]Policy 6.00, Policy Handbook.

Because Schneider has failed to establish the first component of his claim, the Court need not evaluate whether or not he was afforded a hearing procedure that complied with the appropriate level of procedural due process in connection with the termination of his employment, nor determine whether or not he is entitled to money damages for the difference in his compensation from College and his compensation from his subsequent employment, until the date of a due process hearing.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff Max Seifert take nothing on his claim against Defendant Kansas City, Kansas Community College. The Clerk of the Court is hereby ordered to enter judgment in favor of Defendant in this matter.

**IT IS SO ORDERED.**

Dated this 24th day of February, 2010, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE